IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TIFFANIE BRANCH,
individually and on behalf of
all others similarly situated,

      Plaintiff,

v.                       Civil Action No. 3:16-cv-1010

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

      Defendant.

F I L E D
DEC 19 2017
CLERK, U.S. DISTRICT COURT
RICHMOND, VA

## MEMORANDUM OPINION

This matter is before the Court on GEICO'S MOTION FOR SUMMARY JUDGMENT (ECF No. 39). For the reasons set forth below, the motion will be denied.

### BACKGROUND

#### A. Procedural Background

On December 30, 2016, Tiffanie Branch ("Branch") filed a Class Action Complaint on behalf of herself and all others similarly situated, alleging that Government Employees Insurance Company ("GEICO") violated Section 1681b(b)(3)(A) of the Fair Credit Reporting Act ("FCRA"). ECF No. 1. Branch then filed an Amended Class Action Complaint on April 11, 2017, which is the operative complaint here. ECF No. 23.

The parties' initial briefing on GEICO's motion concerned the class that Branch originally proposed, composed of individuals who were assigned a "Fail" grade by GEICO because of any deficiency in their background reports. Id. ¶ 56. However, at oral argument, Branch's counsel indicated that Branch would narrow the class to those individuals who were assigned a "Fail" grade by GEICO specifically because of the criminal history in their background reports. October 3, 2017 Transcript (ECF No. 60) at 42:16-20; September 27, 2017 Transcript (ECF No. 56) at 5:21-6:5. As a result, the parties filed supplemental briefs addressing the summary judgment issues in the context of the narrowed class, ECF No. 65, and this opinion addresses only that class.

## B. Factual Background

### 1. Branch's Application to GEICO

Branch applied for employment with GEICO, and, on August 26, 2016, Branch accepted GEICO's offer to join the company as a Liability Claims Representative, which was contingent on a background check. Around the same time, Branch also completed GEICO's Supplemental Information Form for use in connection with the background check. On that form, Branch listed, as her only criminal conviction a December 2015 conviction for petit larceny.

On September 2, GEICO requested a background check on Branch from a consumer reporting agency, General Information Services ("GIS"). GIS completed Branch's background report ("the Report") and sent it to GEICO on September 21. The Report indicated that Branch had two criminal convictions on her record: the December 2015 misdemeanor petit larceny conviction, as well as, inaccurately, a 2011 felony petit larceny conviction. Camacho Decl. (ECF No. 40-4), Ex. 2 at 10. On September 21, after reviewing the Report, a GEICO employee, Brit Collins, assigned it a preliminary grade of "Fail."[1]

Later that day, another GEICO employee, Latoria Parker ("Parker"), called Branch regarding the contents of the Report. The exact details of the conversation are disputed. Branch said that Parker told her that GEICO's job offer was rescinded because of the 2011 felony conviction in the Report. Parker, on the other hand, testified that she informed Branch that she would receive a letter from GIS about the Report because GEICO had concluded that Branch's criminal history would preclude her from employment at GEICO, and that she could dispute the accuracy of the Report. The parties agree, however, that Branch

---

[1] The basis for the "Fail" grade is disputed but immaterial here, as that fact does not affect whether assigning the "Fail" grade was an adverse action.

told Parker that the 2011 conviction was a misdemeanor petit larceny conviction, not a felony. That night, Branch e-mailed Parker, further explaining that she had been charged with felony grand larceny but that she had pled guilty to a reduced misdemeanor charge.

On September 22, 2016, on GEICO's behalf, GIS sent Branch a letter containing the Report and a summary of Branch's FCRA rights ("the Pre-Adverse Action Letter"). Branch could not recall whether she ever initiated a dispute with GIS about the accuracy of her Report. But, the record is that, by October 3, neither GIS nor GEICO had heard from Branch, so GIS sent Branch a letter stating that GEICO would not be hiring her based on the contents of the Report ("the Adverse Action Letter").

### 2. GEICO's Job Application Process

GEICO's background check process is described in its Adjudication Process for Background Checks ("the Adjudication Process"), Camacho Decl., Ex. 1, which was GEICO's official policy for the use of background reports during the class period, Camacho Decl. ¶ 4. Once GEICO extends a conditional job offer to an applicant, the applicant must complete a Supplemental Information Form, which contains information that a GEICO employee enters into GIS's system. Adjudication Process at 3-5. GIS then generates a background report and marks each

4

portion of the report as either "Pass" or "Review," depending on whether that part satisfies GEICO's employment eligibility requirements. Once GIS completes the background report, a GEICO employee reviews it and assigns it a grade of "Pass" or "Fail," based on whether the report meets GEICO's eligibility requirements.[2] Adjudication Process at 6. This review occurs in all cases, even if GIS has given the report a notation of "Pass." GEICO's "Fail" grade may be appropriate if the report contains felony convictions or certain misdemeanor convictions, or if the report shows a conviction that was not disclosed on the Supplemental Information Form.

As in Branch's case, after GEICO assigns a "Fail" grade, GIS sends the Pre-Adverse Action Letter, initiating a seven-business-day "cure period" during which the applicant can

---

[2] Branch disputes that these employees do "anything more than audit[] or confirm[] that GIS correctly followed the existing criminal records matrix in adjudicating the applicant." Pl. Opp. (ECF No. 45) at 4. But the cited testimony does not use the term "matrix." The Adjudication Process says that GEICO employees use a Criminal Matrix to decide whether to assign a background report a grade of "Pass" or "Fail." See Adjudication Process at 6. GEICO employees' testimony suggests that this is the "matrix" that Branch is referencing. See Parker Dep. (ECF No. 40-3) at 76:14-77:9, 78:12-19; Collins Dep. (ECF No. 40-5) at 44:15-45:8, 45:24-47:15. However, neither the Adjudication Process nor that testimony supports Branch's statement that GIS uses the Criminal Matrix, and no evidence indicates that GIS even has possession of the Matrix. Therefore, even assuming that this fact is material, there is no genuine dispute about which entity grades the report. See Matherly v. Andrews, 859 F.3d 264, 280 (4th Cir. 2017).

address the deficiency in the report that led to the "Fail" grade. When the "Fail" grade relates to the report's criminal history, the applicant must contact GIS directly to dispute the report's accuracy. Nonetheless, a GEICO employee must review the GIS system throughout the cure period to see if the applicant has addressed with GIS the deficiency leading to the "Fail" grade. If the applicant has done so, that employee is required to change the grade from "Fail" to "Pass." Id. at 7.

GIS then mails an Adverse Action Letter to any applicant whose background report still has a "Fail" grade at the end of the cure period, either because the applicant could not, or failed to, cure the inaccuracy. After GIS sends that letter, a GEICO employee informs the applicant that GEICO has rescinded the offer. The Adjudication Process precludes informing the applicant of the rescission before that point. Id. at 7-8.

During the class period, GEICO assigned a "Fail" grade based on criminal history to the background reports of 426 applicants.[3] The final grades for the reports of 96 individuals were eventually changed to "Pass." In addition, the final grades

---

[3] Branch disputed the corresponding number and all related figures for the original class because they were based on inadmissible hearsay. Assuming that statement applies to these new numbers, as is suggested by Branch's continued hearsay objection, this argument is without merit. See infra Section II.

for the reports of 14 applicants were eventually changed to "No Grade." Suppl. Camacho Decl. (ECF No. 68-1) ¶ 8.a-.b. This change would have occurred because the applicant did not proceed with the application process for reasons unrelated to the background report, such as failing the drug screening or withdrawing from consideration for a position. Adjudication Process at 8. Finally, the final grades for the reports of 316 applicants from the putative class remained "Fail" at the end of the cure period. Suppl. Camacho Decl. ¶ 8.b.

## DISCUSSION

### I. Legal Standard

Under Fed. R. Civ. P. 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Supreme Court stated that Rule 56 requires the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322. To enter summary judgment, "there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential

7

element of the nonmoving party's case renders all other facts immaterial." Id. at 323 (internal quotations omitted).

When reviewing a motion for summary judgment, a court must interpret the facts and any inferences drawn therefrom in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017). To successfully oppose a motion for summary judgment, the nonmoving party must demonstrate to the court that there are specific facts that would create a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). However, "'[c]onclusory or speculative allegations do not suffice' to oppose a properly supported motion for summary judgment, 'nor does a mere scintilla of evidence.'" Matherly, 859 F.3d at 280 (quoting Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002)). "Where . . . the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." United States v. Lee, 943 F.2d 366, 368 (4th Cir. 1991).

## II.    Admissibility of Information from GEICO's Spreadsheet

It is first necessary to address Branch's argument that, in deciding GEICO's motion, the Court cannot consider certain

information provided by GEICO about the applicants whose reports received a "Fail" grade during the relevant time period because that information is inadmissible hearsay.

### A. Legal Standard

Rule 56 limits the type of evidence that can be considered on a motion for summary judgment. Under that rule, "[a] party asserting that a fact cannot be . . . genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). However, "[a] party may object that the material cited to support . . . a fact cannot be presented in a form that would be admissible in evidence." Id. 56(c)(2). For the non-objecting party to then have that evidence considered, that party must "identif[y] facts that could be put in admissible form." Jones v. W. Tidwater Reg'l Jail, 187 F. Supp. 3d 648, 654 (E.D. Va. 2016) (internal quotations omitted) (emphasis in original).

### B. Parties' Arguments

In paragraphs 25-30 of its Statement of Material Undisputed Facts, GEICO presented information from a spreadsheet that it produced to Branch, which contained details about all

individuals whose background reports were assigned a "Fail" grade at any time during the hiring process between December 29, 2014 and January 15, 2017. GEICO did not include the spreadsheet as an exhibit, but a GEICO employee, Karen Camacho ("Camacho"), provided a declaration with details from the spreadsheet. Camacho Decl. ¶¶ 11-12. Camacho has given similar information for the individuals in the narrowed class in a supplemental declaration, and the corresponding spreadsheet is attached thereto. Suppl. Camacho Decl. ¶ 8. GEICO relies on this evidence to show that applicants assigned a "Fail" grade have a meaningful opportunity to change that grade during the subsequent cure period.

Branch contends that the spreadsheet is hearsay that the Court cannot consider here. Camacho's statements based on the spreadsheet are therefore also hearsay. GEICO concedes that the spreadsheet is hearsay, but asserts that it can be presented in an admissible form at trial through Fed. R. Evid. 803(6) or 1006, thereby satisfying Rule 56(c)(2).[4] Thus, the relevant question is whether the spreadsheet could be admitted under either provision.

---

[4] GEICO also contends, and Branch does not dispute, that Camacho's testimony is based on her personal knowledge. Therefore, the Court can consider the statements in her declarations as long as the spreadsheet is admissible. See Fed. R. Civ. P. 56(c)(4).

### C.  Analysis

#### 1.  Rule 803(6)

Rule 803(6), the "business records" exception, provides that "[a] record of an act, event, condition, opinion, or diagnosis" is admissible if:

> (A) the record was made at or near the time by . . . someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business . . .;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness . . .; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Courts have consistently held that "evidence that has been compiled from a computer database is also admissible as a business record, provided it meets the criteria" above. U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co., 576 F.3d 1040, 1043 (9th Cir. 2009); accord United States v. Fujii, 301 F.3d 535, 539 (7th Cir. 2002) ("Computer data compiled and presented in computer printouts prepared specifically for trial is admissible under Rule 803(6) . . . ."); Potamkin Cadillac Corp. v. B.R.I. Coverage Corp., 38 F.3d 627, 632 (2d Cir. 1994) ("A business

11

record may include data stored electronically on computers and later printed out for presentation in court, so long as the original computer data compilation was prepared pursuant to a business duty in accordance with regular business practice." (internal quotations omitted).[5] The exception applies "even though the printouts themselves are not kept in the ordinary course of business." Fujii, 301 F.3d at 539 (emphasis omitted).

GEICO argues that it can satisfy each element of Rule 803(6) for the spreadsheet. Each listing contains data recorded at or near the time by someone with knowledge, either manually or by automated action, and that recording is a regular practice of GIS, which maintains the information on behalf of GEICO; the data are maintained in the course of GEICO's routine background check process; and either Camacho or a GIS employee, such as Christopher Truesdale ("Truesdale"), can testify to these conditions. Branch makes three assertions in response: (1) the underlying records are GIS's business records, not GEICO's; (2) this case is different than those cited above because Truesdale used "specialized queries to gather the information," rather

---

[5] Although the Fourth Circuit has not affirmatively recognized this principle, one court in the circuit has cited these cases favorably. See Sprint Nextel Corp. v. Simple Cell Inc., 248 F. Supp. 3d 663, 672-73 (D. Md. 2017).

than printing it out; and (3) Camacho is not an appropriate custodian witness.

All three arguments fail. First, the evidence shows that the underlying records belong to GEICO. It is true that the information that GEICO seeks to introduce is "resident in GIS's database." Truesdale Decl. (ECF No. 40-6) ¶ 4. But GIS maintains this database on GEICO's behalf. Suppl. Camacho Decl. ¶ 5. In addition, both GEICO and GIS employees access the database on a regular basis, and several categories of information in the spreadsheet are entered solely by GEICO employees. Id. ¶¶ 5-6. Branch cites no cases holding that information accessible to, and entered by, one company's employees becomes another company's business records simply because the database in which that information is entered resides on the second company's servers.

Moreover, whether the records are GEICO's or GIS's makes no difference, because Rule 803(6) does not require that "'that the records be prepared by the party who has custody of the documents and seeks to introduce them into evidence.'" Phoenix Assocs. III v. Stone, 60 F.3d 95, 101 (2d Cir. 1995) (quoting 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.08[8][a] (2d ed. 2006)); see also Midfirst Bank, SSB v. C.W. Haynes & Co., 893 F. Supp. 1304, 1310 (D.S.C. 1994)

("Business records of an entity are admissible even though another entity made the records . . . ."). Instead, "all that is required is proof that it was the business entity's regular practice to get information from the person who created the document." Phoenix Assocs., 60 F.3d at 101 (internal quotations omitted). GIS regularly provides the information in the spreadsheet to GEICO when GIS sends GEICO background report data. Suppl. Camacho Decl. ¶ 5. Accordingly, Branch's concern about which entity creates the records is misplaced.

Second, gathering information through a query does not change the "regular practice" analysis here. As an initial matter, Branch cannot distinguish all the cases cited by GEICO; the proponent in U-Haul International, for example, "quer[ied] the computer to compile the information to create the summaries" that were held admissible under Rule 803(6). 576 F.3d at 1045. Furthermore, Branch's approach

> ignores the realities of modern business litigation, where many business records are kept in databases . . . . [P]roducing limited data from a larger database is more akin to reviewing a set of documents in response to a discovery request and producing only responsive documents, than it is creating a new data compilation or document for the purposes of litigation.

Health Alliance Network, Inc. v. Cont'l Cas. Co., 245 F.R.D. 121, 129 (S.D.N.Y. 2007). For that reason, "a smaller subset of

14

data provided as evidence from [a] database" is admissible under Rule 803(6) if all the rule's elements are met. Id. Similarly, in Sprint Nextel, the court observed that, where "a proponent queries a database in order to extract data that is responsive to ongoing litigation," Rule 803(6) generally makes the compiled information admissible as long as "the content of responsive records . . . [is] presented with minimal alterations." 248 F. Supp. 3d at 673. Under this approach, certain summaries would not qualify as business records if they are compiled through "selective extraction." See id. (spreadsheets were not business records because they "combine[d] data from at least three different . . . databases and ha[d] been edited to remove redundancies"). The queries leading to GEICO's spreadsheet, by contrast, identified pertinent fields in the class members' background reports, arranged them in a logical manner, and reproduced the information from those fields verbatim on the spreadsheet. Camacho Decl. ¶ 11. Branch's spreadsheet entry shows that Truesdale's queries simply copied and pasted information from her report to the spreadsheet. Compare Camacho Decl., Ex. 2 at 8 with Suppl. Camacho Decl., Attachment at 4. As a result, the spreadsheet more closely resembles the "printouts" with "minimal alterations," making it a business record.

15

Third, Camacho's supplemental declaration shows that she is an appropriate custodian witness. Camacho stated that, "[a]s a result of my access to the GIS system and my review of the data GIS stores on GEICO's behalf, I have direct personal knowledge about the type of data available on that database, how it is stored, and how it can be accessed." Suppl. Camacho Decl. ¶ 5. She then explains what information each field in the spreadsheet includes, and how that information is originally entered in GIS's system. Id. ¶ 6. This knowledge satisfies the minimal requirement that a testifying employee be "familiar with the record-keeping practices of a business." Nader v. Blair, 549 F.3d 953, 963 (4th Cir. 2008). Even if Camacho did not qualify to testify about the compilation of the underlying data, Truesdale likely would—a point that Branch does not dispute. Truesdale Decl. ¶ 2. Accordingly, GEICO has identified two witnesses who can testify that: (1) the information for each applicant was entered into GIS's system at or near the time that information was generated; (2) the persons who entered the information had knowledge of the data they entered; and (3) the information was kept in the course of GEICO's regularly conducted business activity. See U-Haul Int'l, 576 F.3d at 1044. Thus, the background report data summarized in GEICO's spreadsheet is admissible under Rule 803(6).

Because GEICO can satisfy the business record requirements for the data in the spreadsheet, it asserts that the Court need not address whether Rule 1006 applies here. See id. at 1046 ("[T]he summaries themselves constituted the business records. . . . Thus, Rule 1006 does not apply."). Some courts, however, have suggested that the Rule 803(6) analysis does not end the inquiry. See United States v. Loney, 959 F.3d 1332, 1340-41 (5th Cir. 1992) (finding summary of data admissible under Rule 1006 after concluding that underlying data qualified as business records); Sprint Nextel, 248 F. Supp. 3d at 673 ("[T]he court is inclined to view the spreadsheets as summaries of relevant information rather than 'business records' per se."). As a result, the Court will examine whether GEICO can satisfy Rule 1006 before considering the spreadsheet here.

## 2. Rule 1006

Under Rule 1006, "[t]he proponent may use a summary . . . to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." However, for this summary to be admissible, "[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. In addition, "the records summarized must otherwise be admissible in

17

evidence." United States v. Janati, 374 F.3d 263, 272 (4th Cir. 2004). The records in GEICO's spreadsheet are admissible under Rule 803(6), as discussed above. Thus, the sole remaining question is whether GEICO has made those records available to Branch, or is capable of doing so.

GEICO argues that it met this requirement by offering, during a July 20, 2017 telephonic meet-and-confer conference, to give Branch a written explanation for how the spreadsheet was compiled, and to make class members' background report information available electronically at Branch's request. Branch's counsel agreed to respond to this offer if he determined that Branch needed any information beyond what was in the spreadsheet, but never did so. Branch contends that the offer did not satisfy Rule 1006 because an explanation of how the spreadsheet was put together is not the same as the original data itself.

This record demonstrates that GEICO has made the information underlying the spreadsheet available in the manner contemplated by Rule 1006. During the July 20 call, GEICO's counsel stated that he would provide an explanation of how the spreadsheet was compiled so that Branch's counsel could "evaluate it and then . . . tell me if you need to know more to assess whether you intend to take a position that [the

spreadsheet]'s inauthentic or insufficient." ECF No. 68-5 at 56:20-24. Branch correctly points out that an explanation of the summarized data's compilation is not equivalent to the "original[]" data itself, which is what must be provided. Fed. R. Evid. 1006. After all, the purpose of the availability requirement is "to afford a process to test the accuracy of the chart's summarization." Janati, 374 F.3d at 273. It would be impossible for Branch to do so if she only had an explanation about the summary's compilation, and not the underlying data. Even if printing out the relevant information from GIS's database would be unduly burdensome, GEICO could conceivably produce a copy of the database to Branch, Gen. Refractories Co. v. First State Ins. Co., No. CIV.A. 04-3509, 2015 WL 3450391, at *9-10 (E.D. Pa. May 29, 2015), or designate a place and time for Branch's counsel to inspect the database. It has done neither.

However, that failure is not dispositive because the discovery record shows that Branch had all the information needed to ensure the accuracy of the spreadsheet. GEICO objected to Branch's document request for "[a]ll records for all applicants" assigned a "Fail" grade during the class period as unduly burdensome, given the quantity of that information, and produced the spreadsheet instead. ECF No. 49-3 at 35. But GEICO also produced all of the data from GIS's database for Branch

19

before the July 20 call. And GEICO's counsel made clear—both before and during that call—that GEICO would provide additional information from the database for other class members as necessary to assist Branch's counsel in reviewing the spreadsheet. Branch never responded to these repeated proposals; in fact, Branch's counsel stated during the July 20 call that Branch did not want other class members' information. ECF No. 68-5 at 51:12-15. This failure by Branch's counsel to take up the offers for additional information from the database shows that Branch has received all the information she needs to review the spreadsheet as a summary. See United States v. Jamieson, 427 F.3d 394, 410-11 (6th Cir. 2005). GEICO can therefore satisfy Rule 1006. To hold otherwise would be an exercise in formalism.

For the foregoing reasons, GEICO has shown that it could put the spreadsheet in admissible form under Rules 803(6) and 1006. Accordingly, Branch's Rule 56(c)(2) objection to the spreadsheet fails, and the Court will therefore consider it and Camacho's declarations in deciding GEICO's motion.

### III.   Adverse Action under Section 1681b(b)(3)(A)

GEICO argues that it is entitled to summary judgment because the action it takes—assigning a "Fail" grade to an applicant's background report—does not qualify as adverse action under the FCRA.

**A.    Legal Standard**

Section 1681b(b)(3)(A) requires that:

> [I]n using a consumer report for employment
> purposes, before taking any adverse action
> based in whole or in part on the report, the
> person intending to take such adverse action
> shall provide to the consumer to whom the
> report relates—
>
> (i)    a copy of the report; and
>
> (ii) a description in writing of the
> rights of the consumer under this
> subchapter, as prescribed by the Bureau
> under section 1681g(c)(3) of this title.

Therefore, to implicate this provision, an employer must first form an intent to take adverse action, and then must give notice to the consumer before the employer takes such adverse action. Costa v. Family Dollar Stores of Va., Inc., 195 F. Supp. 3d 841, 844 (E.D. Va. 2016).

The FCRA contains several definitions for the phrase "adverse action." Two are relevant here. In the employment context, adverse action may be "a denial of employment or any other decision for employment purposes that adversely affects any current or prospective employee." 15 U.S.C. § 1681a(k)(1)(B)(ii). In addition, under the FCRA's catch-all definition, adverse action is "an action taken or determination that is-(I) made in connection with an application

21

that was made by . . . any consumer . . .; and (II) adverse to the interests of the consumer."[6] Id. § 1681a(k)(1)(B)(iv).

### B. Parties' Arguments

GEICO asserts that summary judgment is appropriate because assigning a "Fail" grade to a report is a reflection of GEICO's intent to take adverse action, and not the adverse action itself. GEICO characterizes the issue here as a matter of statutory interpretation, which is a question of law that the Court can resolve at the summary judgment stage. And Section 1681b(b)(3)(A)'s language is straightforward: an employer must provide notice to a consumer who will be subject to adverse action based on the contents of a background report only where the employer "intend[s] to take such adverse action." In other words, notice is not required unless the employer has already decided to take adverse action based on a report.

---

[6] GEICO contends that this definition is not relevant here, but the Court has recognized that it might apply to an employer's actions based on a background report. See Manuel v. Wells Fargo Bank, Nat'l Ass'n, 123 F. Supp. 3d 810, 820-21 (E.D. Va. 2015); see also Goode v. LexisNexis Risk & Info. Analytics Grp., Inc., 848 F. Supp. 2d 532, 540-41 (E.D. Pa. 2012). However, the parties focus their dispute on Section 1681a(k)(1)(B)(ii), and Branch does not seriously advance any argument under subsection (iv). Accordingly, the Court does not address whether GEICO's actions qualify as adverse action under that provision.

GEICO relies primarily on two cases, Manuel and Costa, which involved facts that were very similar to those presented in this action, yet reached opposite conclusions on motions for summary judgment. In Manuel, defendant reviewed criminal background reports generated by a third party, First Advantage, to determine if current or prospective employees were eligible for positions. 123 F. Supp. 3d at 814. If an employee was deemed ineligible, defendant entered a code noting that, causing First Advantage to send a "Pre-Adverse Action Notice." Id. at 815. If the employee did not dispute the background report during a five-day cure period, First Advantage then sent an "Adverse Action Notice." Id.

The Court observed that coding the employee as ineligible was not a final decision affecting the employee, but rather a "pending" decision not to hire, which the employee had a "meaningful opportunity to dispute." Id. at 823. Moreover, the evidence indicated that the defendant "was willing to investigate any background checks . . . that a consumer believed were incorrect or unfair." Id. Nonetheless, the Court denied summary judgment because it concluded that there was a disputed issue of fact as to when the defendant actually took adverse action against plaintiffs and that "[a] reasonable jury could find that [defendant]'s adverse hiring decision was final when

23

it was first relayed to First Advantage because [defendant] was comfortable adhering to that decision without reviewing it if the individual did not file a dispute." Id.

Similarly, in Costa, First Advantage assigned a code to applicants' background reports based on defendant's hiring criteria. 195 F. Supp. 3d at 843. If a report was coded as "Not Recommended," then First Advantage sent the applicant the report and a statement of FCRA rights. Id. An applicant could initiate a dispute within five days after receiving the First Letter Packet, leading to an independent review by defendant.[7] If no dispute was lodged, then First Advantage sent a second letter on defendant's behalf rescinding the conditional offer of employment. Id.

Unlike Manuel, the Costa court concluded that coding an applicant as "Not Recommended" was not adverse action, since it was "an internal decision from which the applicant d[id] not suffer any adverse effect." Id. at 846. The adverse action was instead defendant's rescission of a conditional job offer or termination of a current employee. See id. Accordingly, the court granted summary judgment, distinguishing Manuel on the

---

[7] The court noted that defendant changed an applicant's code from "Not Recommended" to "Recommended" in 35% of cases where the applicant initiated a dispute after receiving the First Letter Packet. Costa, 195 F. Supp. 3d at 843.

grounds that "[n]othing in the record here creates any such jury question [as in Manuel]. The facts are not at issue, only the legal effects of the facts. And . . . the act of coding an applicant as not recommended is not adverse action under the FCRA as a matter of law." Id.

GEICO contends that, under these cases, assigning a "Fail" grade only indicates GEICO's intent to withdraw a conditional job offer, not the adverse action itself. Indeed, says GEICO, under the Adjudication Process, GEICO cannot rescind a conditional offer unless the applicant has failed to dispute or has failed to cure the report's defects after receiving the Pre-Adverse Action Letter. Furthermore, says GEICO, the dispute process works effectively, as more than 20% of all applicants whose reports were initially assigned a "Fail" grade because of criminal history ultimately received a "Pass" grade. Therefore, according to GEICO, the assignment of the "Fail" grade and the sending of the Pre-Adverse Action Letter have the precise effect that the FCRA intended—that is, to "slow[] down the [hiring] process to allow consumers to dispute or discuss potentially harmful information." Id. at 845.

In response, Branch asserts that GEICO's assignment of the "Fail" grade is effectively a final decision to withdraw a conditional offer. Branch makes three main points in support of

this argument. First, she contends that the cases cited by GEICO regarding internal decisions not being adverse actions do not apply here, because GEICO's communication of the "Fail" grade to GIS has an actual effect: starting the automatic process of sending the notices, which an applicant cannot stop without a successful dispute with GIS. Second, under Manuel, whether GEICO's assignment of a "Fail" grade is an adverse action is a fact question. Given the factual similarity between this case and Manuel, Branch argues, the Court necessarily must reach the same conclusion about the existence of a dispute of material fact. Finally, Branch asserts that there is no meaningful dispute process for applicants to resolve inaccuracies in their criminal histories after they receive the Pre-Adverse Action Letter. Indeed, says Branch, the fact that Parker, a GEICO employee, characterized the cure period as allowing applicants to "have a chance to change GEICO's mind" permits an inference that GEICO has already reached a final decision when it assigns a "Fail" grade, and that inference must be drawn in Branch's favor.[8]

---

[8] Branch also points to Beverly v. Wal-Mart Stores, Inc., No. CIV.A. 3:07CV469, 2008 WL 149032 (E.D. Va. Jan. 11, 2008) in arguing that the effectiveness of GEICO's cure process is irrelevant if adverse action has already occurred. But the facts of that case are just as different from the facts here as they were from the facts in Manuel, where the Court found Beverly

### C.  Analysis

The issue here is whether GEICO took an adverse action against Branch and other class members when it assigned a "Fail" grade. This Court and others have consistently recognized that an employer's formation of intent to take adverse action and the adverse action itself are distinct. See Manuel, 123 F. Supp. 3d at 822; see also Costa, 195 F. Supp. 3d at 844-45; Moore v. Rite Aid Headquarters Corp., 33 F. Supp. 3d 569, 574 (E.D. Pa. 2014). Put otherwise, "[t]he formation of such intent . . . cannot be the adverse action itself." Manuel, 123 F. Supp. 3d at 822 (internal quotations omitted); see also Moore, 33 F. Supp. 3d at 574 ("[A]n internal decision to rescind an offer, standing alone, cannot be considered an adverse action.").

Branch is correct that, as the Court previously has held, whether coding an applicant in a certain way is an adverse action is a fact question. Manuel, 123 F. Supp. 3d at 822-23. But categorizing an employer's action as a tentative internal decision or a final decision depends on the evidence about the particular background check process at issue. If, as in Manuel, the process is structured so that an applicant will necessarily suffer adverse action after his report is given a particular

---

inapposite. Manuel, 123 F. Supp. 3d at 822 n.8. Therefore, the Court declines to consider Beverly in deciding if GEICO's "Fail" grade was an adverse action.

grade, then what is apparently an internal decision may actually be a final decision. See id. at 823; Moore, 33 F. Supp. 3d at 574 ("An employer cannot satisfy § 1681b(b)(3) by formally designating some future point in time as the moment of 'final decision' if, in fact, that decision already has been made."). Moreover, summary judgment is improper if there is a genuine dispute of fact as to how the background check process works, since a jury would need to determine whether, based on the facts, the employer's action was an internal decision or a final one. See Manuel, 123 F. Supp. 3d at 823.

In contrast, where it is undisputed that an applicant has a legitimate opportunity to cure inaccuracies in a report before receiving an adverse employment decision, assigning a "Fail" grade does not necessarily cause any adverse effect, and summary judgment could be appropriate. See Costa, 195 F. Supp. 3d at 846; Ramos v. Genesis Healthcare, LLC, 141 F. Supp. 3d 341, 348-49 (E.D. Pa. 2015) (internal decision was not adverse action because employer remained in contact with prospective employee after coding him as ineligible for employment). Accordingly, GEICO must show that there is no genuine dispute of fact concerning applicants' ability to cure the defects in their reports after receiving the Pre-Adverse Action Letter.

The record has evidence that supports both parties on this issue. The Pre-Adverse Action Letter contains tentative language, stating that "GEICO has or will be completing their review of your application within the next few days, and may take action based on the enclosed report." Camacho Decl., Ex. 2 at 1. The Adjudication Process also allows seven business days for applicants to cure deficiencies, a longer time than the five-day period in Costa and Manuel. Adjudication Process at 3. Moreover, the Process explicitly prohibits GEICO employees from rescinding the conditional offer to the applicant at any point before the cure period has expired, id. at 8, indicating that GEICO must give the applicant that time to cure. In Branch's case, Parker even reached out to Branch after GEICO assigned her a "Fail" grade, which is inconsistent with Branch's contention that GEICO made a final decision. See Ramos, 141 F. Supp. 3d at 349.

The legitimacy of GEICO's cure process is further demonstrated by applicants' success in correcting inaccuracies. 96 of 426 individuals with an initial "Fail" grade because of their criminal histories—more than 20% of the class—were able to change their grades to "Pass" through this dispute process. Suppl. Camacho Decl. ¶ 8.a-.b. This evidence shows that GEICO's cure period is not just a "pro forma" one, and that applicants

instead have a "real" chance "to change [GEICO]'s mind." Magallon v. Robert Half Int'l, Inc., 311 F.R.D. 625, 633 (D. Or. 2015). Indeed, the presence of a similarly effective cure process in Costa was a factor in the court's finding that defendant's coding was not adverse action. See 195 F. Supp. 3d at 843.

Most of Branch's responses to these points either lack evidentiary support[9] or are otherwise unconvincing. Branch's assertion that GEICO's internal decision is transformed into a final one merely because GEICO communicates the "Fail" grade to GIS is unavailing because GIS is acting in this case as GEICO's agent. See Costa, 195 F. Supp. 3d at 845 (for purposes of determining when adverse action occurs, "[i]t matters not that [defendant] . . . outsources parts of its process to [a third party]"). Similarly, Branch does not explain how the cure process for criminal background inaccuracies is insufficient. GEICO is "not the producer[] of the report and the information that's contained [t]here," GEICO 30(b)(6) Dep. (ECF No. 40-2) at 82:4-5. Thus, it is unclear why Branch would expect GEICO to

---

[9] For instance, Branch cites several pages of the GEICO Rule 30(b)(6) deposition to show that GIS, not GEICO, actually grades the reports. However, that argument is plainly inconsistent with the Adjudication Process, and none of those pages support the statements for which Branch cites them. See Adjudication Process at 2 ("GIS does not and will not determine a candidate's eligibility to work at GEICO.").

correct GIS's mistakes, particularly when GEICO has already delegated other tasks in the hiring process to GIS. Moreover, the Adjudication Process requires GEICO employees to review GIS's system on a regular basis during the cure period to see if the applicant addresses the deficiencies leading to the "Fail" grade, and to change the grade from "Fail" to "Pass" if the applicant does so. Adjudication Process at 7. Thus, there is no substantive difference between having applicants go through GIS or GEICO to correct inaccuracies in their criminal histories.

Finally, that the purpose of GEICO's dispute process is to convince GEICO to change its mind is not evidence of a final decision, but rather the very manner in which dispute processes are supposed to operate under the FCRA. See Magallon, 311 F.R.D. at 633 ("[T]o comply with the [FCRA], an employer who intends to take adverse action must give the applicant an opportunity to change the employer's mind."). Branch cites no cases recognizing the supposed distinction between "changing an employer's mind before the decision process starts" and "changing an adverse-action decision after the employer has made it." Pl. Suppl. Brief (ECF No. 70) at 9-10. And, even though the Adjudication Process refers to the initial grade for a background report as GEICO's "final" hiring decision, the evidence of GEICO's cure process shows that label to be nominal in practice.

Despite those facts in GEICO's favor, Branch's testimony that Parker told her, before the Adverse Action Letter was even sent, that GEICO was rescinding her offer creates a genuine dispute about the finality of GEICO's decision when it assigns a "Fail" grade. This evidence shows only that a GEICO employee deviated from the Adjudication Process—which requires waiting until the end of the cure period to inform an applicant of the rescission of an offer—in one instance. Yet, even if GEICO is right (and it likely is) that a single deviation is not material to whether GEICO has taken adverse action as to every class member, this factual dispute is material to the question whether GEICO took adverse action as to Branch in particular. From the disputed evidence, a jury could infer that GEICO already had reached a final decision to rescind Branch's offer when it assigned her a "Fail" grade, thereby making the ensuing cure period meaningless in Branch's case. Furthermore, there is no evidence that any GEICO employee contacted Branch after her call with Parker or internally discussed the concerns Branch expressed during the call, so GEICO cannot be said to have "remain[ed] involved in addressing [Branch]'s challenge" after that point. Ramos, 141 F. Supp. 3d at 349.

GEICO has presented substantial evidence to show that assigning a "Fail" grade is a tentative rather than final

decision. The Pre-Adverse Action Letter contained tentative language about an applicant's employment, the Adjudication Process gave applicants a "meaningful opportunity to dispute" the background reports, and GEICO "was willing to investigate any background checks . . . that a[n applicant] believed were incorrect": these are all factors weighing in favor of summary judgment. See Manuel, 123 F. Supp. 3d at 823. At the same time, unlike in Costa and Ramos, there is a genuine dispute as to the finality of GEICO's decisionmaking process at the grading stage and GEICO's subsequent involvement with applicants, given the possibility that Parker might have deviated from the Adjudication Process and informed Branch of her offer being rescinded immediately after GEICO assigned her a "Fail" grade. As a result, "[a] reasonable jury could find that [GEICO]'s adverse hiring decision was final when it was first relayed to [GIS]" because this evidence shows that GEICO had made up its mind to rescind Branch's offer notwithstanding any cure period. Manuel, 123 F. Supp. 3d at 823. Accordingly, the Court cannot resolve the adverse action issue at the summary judgment stage.

Given the factors discussed above, a jury could, at least in Branch's case, consider GEICO's assignment of a "Fail" grade a final decision rather than an internal one, such that it could not be reversed following appropriate dispute by Branch. As a

result, there is a genuine material dispute about whether GEICO took adverse action against Branch when it assigned her a "Fail" grade, making summary judgment on Branch's claim inappropriate.[10]

## CONCLUSION

For the foregoing reasons, GEICO'S MOTION FOR SUMMARY JUDGMENT (ECF No. 39) will be denied.

It is so ORDERED.

/s/         REP

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: December 18, 2017

---

[10] Of course, this result, as to Branch and her individual claim, does not necessarily mean that the case is suitable to proceed as a class action. That is the subject of a different motion.