TIFFANIE BRANCH,
individually and on behalf of
all others similarly situated,

    Plaintiff,

v.                                    Civil Action No. 3:16-cv-1010

GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION (ECF No. 66). For the reasons set forth below, the motion will be denied.

### BACKGROUND

**A.  Procedural Background**

On December 30, 2016, Tiffanie Branch ("Branch") filed a Class Action Complaint on behalf of herself and all others similarly situated, alleging that Government Employees Insurance Company ("GEICO") violated Section 1681b(b)(3)(A) of the Fair Credit Reporting Act ("FCRA"). ECF No. 1. That provision requires that:

> In using a consumer report for employment purposes, before taking any adverse action based in whole or in part on the report, the person intending to take such adverse action

> shall provide to the consumer to whom the
> report relates: (i) a copy of the report;
> and (ii) a description in writing of the
> rights of the consumer under this
> subchapter, as presented by the Bureau under
> section 1681g(c)(3) of this title.

Branch then filed an Amended Class Action Complaint on April 11, 2017, which is the operative complaint here. ECF No. 23.

GEICO moved for summary judgment on August 18, 2017. ECF No. 39. The Court denied that motion on December 18, 2017, ECF No. 74, finding that a genuine dispute of material fact existed as to whether GEICO had complied with Section 1681b(b)(3)(A) when interacting with Branch specifically. Memorandum Opinion (ECF No. 73) ("Summary Judgment Op.") at 32-33.

Also on August 18, 2017, Branch initially moved for class certification. ECF No. 41. The briefing on that motion concerned a proposed class of individuals who were assigned a "Fail" grade by GEICO because of any deficiency in their background reports. ECF No. 42 at 9. However, at oral argument on GEICO's summary judgment motion, Branch's counsel stated that Branch would narrow the class to those individuals assigned a "Fail" grade specifically because of the criminal histories in their background reports. October 3, 2017 Transcript (ECF No. 60) at 42:16-20; September 27, 2017 Transcript (ECF No. 56) at 5:21-6:5.

As a result, Branch filed a renewed motion for class certification on October 16, 2017. ECF No. 66. GEICO has opposed the motion. ECF No. 71. Branch has replied. ECF No. 72. Thus, the matter is now ripe.

## B.   Factual Background

### 1.   Branch's Application to GEICO

Branch applied for employment with GEICO, and, on August 26, 2016, Branch accepted GEICO's offer to join the company as a Liability Claims Representative. The offer was contingent on the results of a background check. Around the same time, Branch also completed GEICO's Supplemental Information Form for use in connection with the background check. On that form, Branch listed, as her only criminal conviction, a December 2015 conviction for petit larceny.

On September 2, GEICO requested a background check on Branch from a consumer reporting agency, General Information Services ("GIS"). GIS completed Branch's background report ("the Report") and sent it to GEICO on September 21. The Report reflected that Branch had two criminal convictions on her record: the December 2015 misdemeanor petit larceny conviction (that Branch reported), as well as a 2011 felony petit larceny conviction (that Branch did not report). Camacho Decl. (ECF No. 71-4), Ex. 2 at 10. The Report erroneously characterized the 2011 conviction as a felony. On September 21, after reviewing

the Report, a GEICO employee, Brit Collins, assigned it a preliminary grade of "Fail"[1] because of a "CRIM1" code.[2]

Later that day, another GEICO employee, Latoria Parker ("Parker"), called Branch regarding the contents of the Report. The exact details of the conversation are disputed. Branch said that Parker told her that GEICO's job offer was rescinded because of the 2011 felony conviction in the Report. Parker, on the other hand, testified that she informed Branch that she would receive a letter from GIS about the Report because GEICO had concluded that Branch's criminal history would preclude her from employment at GEICO, and that she could dispute the accuracy of the Report. The parties agree, however, that Branch told Parker that the 2011 conviction was a misdemeanor petit larceny conviction, not a felony. That night, Branch e-mailed Parker, further explaining that she had been charged with felony grand larceny, but that she had pled guilty to a reduced misdemeanor charge.

On September 22, 2016, on GEICO's behalf, GIS sent Branch a letter containing the Report and a summary of Branch's FCRA rights ("the Pre-Adverse Action Letter"). Branch could not

---

[1] The basis for the "Fail" grade is disputed but immaterial here, as that dispute does not implicate the factors relevant to class certification.

[2] As discussed below, GEICO uses a variety of codes such as this to notify applicants why they are ineligible for employment at GEICO.

recall whether she ever initiated a dispute with GIS about the accuracy of her Report. But, by October 3, neither GIS nor GEICO had heard from Branch, so GIS sent Branch a letter stating that GEICO would not be hiring her based on the contents of the Report ("the Adverse Action Letter").

### 2. GEICO's Job Application Process

GEICO's background check process is described in its Adjudication Process for Background Checks ("the Adjudication Process"), Camacho Decl., Ex. 1, which was GEICO's official policy for the use of background reports during the class period, Camacho Decl. ¶ 4. Once GEICO extends a conditional job offer to an applicant, the applicant must complete a Supplemental Information Form, which contains information that a GEICO employee enters into GIS system. Adjudication Process at 3-5. GIS then generates a background report and marks each portion of the report as either "Pass" or "Review," depending on whether that part satisfies GEICO's employment eligibility requirements. Once GIS completes the background report, a GEICO employee reviews it and assigns it a grade of "Pass" or "Fail," based on whether the report meets GEICO's eligibility requirements. This review occurs in all cases, even if GIS has given the report a notation of "Pass." The employee must also

enter one or more codes noting the reason for the "Fail" grade.[3] Adjudication Process at 6. That grade may be appropriate if the report contains felony convictions or certain misdemeanor convictions, or if the report shows a conviction that was not disclosed on the Supplemental Information Form.

As in Branch's case, after GEICO assigns a "Fail" grade, GIS sends the Pre-Adverse Action Letter, initiating a seven-business-day "cure period" during which the applicant can address the deficiency in the report that led to the "Fail" grade. When the "Fail" grade relates to the report's criminal history, the applicant must contact GIS directly to dispute the report's accuracy. Nonetheless, a GEICO employee must review the GIS system throughout the cure period to see if the applicant has addressed with GIS the deficiency leading to the "Fail" grade. If the applicant has done so, that employee is required to change the grade from "Fail" to "Pass." Id. at 7.

GIS then mails an Adverse Action Letter to any applicant whose background report still has a "Fail" grade at the end of the cure period, either because the applicant could not, or failed to, cure the inaccuracy. After GIS sends that letter, a GEICO employee informs the applicant that GEICO has rescinded

---

[3] The only codes relevant here are "CRIM1," "CRIM2," and "CRIM3," which concern applicants' criminal histories.

the offer. The Adjudication Process precludes informing the applicant of the rescission before that point. Id. at 7-8.

During the class period, GEICO assigned a "Fail" grade based on criminal history to the background reports of 426 applicants.[4] The final grades for the reports of 96 individuals were eventually changed to "Pass." In addition, the final grades for the reports of 14 applicants were eventually changed to "No Grade." Suppl. Camacho Decl. (ECF No. 71-8) ¶ 8.a-.b. This change would have occurred because the applicant did not proceed with the application process for reasons unrelated to the background report, such as failing the drug screening or withdrawing from consideration for a position. Adjudication Process at 8. Finally, the final grades for the reports of 316 applicants from the putative class remained "Fail" at the end of the cure period. Suppl. Camacho Decl. ¶ 8.b.

## C. The Proposed Class

Branch seeks to certify one class. That class is defined as:

> All natural persons residing in the United
> States (including all territories and other
> political subdivisions of the United States)
> (a) who submitted an employment application
> or other request for placement to GEICO and
> received a conditional job offer; (b) who

---

[4] Branch reiterates her position from the summary judgment briefing that the Court cannot consider these numbers because they are based on inadmissible hearsay. However, that argument is rejected here for the same reasons that it was rejected in considering GEICO's summary judgment motion. Summary Judgment Op. at 8-20.

were the subject of a GIS consumer report which was used by GEICO to make an employment decision from December 29, 2014 to the present; (c) about whom GEICO inserted a "FAIL" adjudication in the GIS system based on a coding of CRIM1, CRIM2, or CRIM3; and (d) to whom GEICO did not provide a copy of the consumer report and summary of rights as required by 15 U.S.C. § 1681b(b)(3) at least five business days before the date the consumer's report at GIS was first graded with the "FAIL" result.

Branch further asserts that a class should be certified even if the Court concludes that those proposed class members who were eventually hired by GEICO or withdrew from the application process before the end of the cure period suffered no adverse action. In that case, Branch argues, the Court should simply modify the class definition to exclude the proposed class members who were hired by GEICO or withdrew.

## DISCUSSION

### I. Legal Standard

To obtain class certification, a plaintiff must satisfy the four requirements of Fed. R. Civ. P. 23(a): numerosity, commonality, typicality, and adequacy of representation. EQT Prod. Co v. Adair, 764 F.3d 347, 358 (4th Cir. 2014). The case must also fall within at least one of the types of class actions defined in Rule 23(b). Here, Branch seeks certification under Rule 23(b)(3), which requires the Court to find "that the questions of law or fact common to class members predominate

over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The Court must perform a "rigorous analysis" to determine whether the plaintiff has met its required showing as to each class certification factor. Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011) (internal quotations omitted). This analysis extends to issues of liability as well as damages and causation. See Comcast Corp. v. Behrend, 569 U.S. 27, 34-38 (2013). The Court is not required "to accept plaintiff['s] pleadings when assessing whether a class should be certified." Gariety v. Grant Thornton, LLP, 368 F.3d 356, 365 (4th Cir. 2004); see also Dukes, 564 U.S. at 350. Rather, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." Dukes, 564 U.S. at 350 (emphasis in original).

Because of this standard, "the district court must take a 'close look' at the facts relevant to the certification question and, if necessary, make specific findings on the propriety of certification." Thorn v. Jefferson-Pilot Life Ins. Co., 445 F.3d 311, 319 (4th Cir. 2006) (quoting Gariety, 368 F.3d at 365).

Such findings are necessary "even if the issues tend to overlap into the merits of the underlying case," but "the likelihood of the plaintiffs' success on the merits . . . is not relevant to the issue of whether certification is proper." Id. Nonetheless, the Court's analysis will often "entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." Dukes, 564 U.S. at 351. At the same time, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage. Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013).

## II.  Rule 23(a)

Rule 23(a) establishes four requirements for class certification. They are that: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the representative's claims or defenses are typical of those of the class; and (4) the representative will fairly and adequately represent the interests of the class. Fed. R. Civ. P. 23(a)(1)-(4). The final three requirements "tend to merge, with commonality and typicality 'serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and

whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir. 1998) (quoting Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 157 n.13 (1982)) (alterations in original). The plaintiff bears the burden of proving all the requirements of Rule 23. Gregory v. Finova Capital Corp., 442 F.3d 188, 190 (4th Cir. 2006).

        In addition to those requirements, "[a]n order that certifies a class action must define the class and the class claims, issues, or defenses." Fed. R. Civ. P. 23(c)(1)(B). "'[T]he definition of the class is an essential prerequisite to maintaining a class action.'" Soutter v. Equifax Info. Servs., LLC, 307 F.R.D. 183, 196 (E.D. Va. 2015) (quoting Roman v. ESB, Inc., 550 F.2d 1343, 1348 (4th Cir. 1976)). The Court should not certify a class unless "it is administratively feasible for the court to determine whether a particular individual is a member." EQT Prod., 764 F.3d at 358 (internal quotations omitted). In other words, "Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable." Id. (internal quotations omitted). This is known as the ascertainability requirement. Id.

## A. Ascertainability

To certify a class under Rule 23, a court must be able to "readily identify the class members in reference to objective criteria." EQT Prod., 764 F.3d at 358; see also 5 James Wm. Moore et al., Moore's Federal Practice § 23.21[1] (3d ed. 2016) (class definition must provide court with "tangible and practicable standards for determining who is and who is not a member of the class"). "The plaintiff[] need not be able to identify every class member at the time of certification. But if class members are impossible to identify without extensive individualized fact-finding or 'mini-trials,' then a class action is inappropriate." EQT Prod., 764 F.3d at 358.

Branch argues that the putative class satisfies the ascertainability requirement because objective criteria define the class, and GEICO does not contest this assertion.

GEICO has acknowledged that it is able to identify, and in fact has already identified, the applicants who received a "Fail" grade because of the criminal histories on their background reports during the relevant time period. Suppl. Camacho Decl. ¶ 8; id., Attachment A. GIS also collects and maintains data contained in background reports for all of its clients, including GEICO, and that data is accessible. Truesdale Decl. (ECF No. 71-6) ¶ 2. Those reports contain the applicants' names, and can be filtered to view only those reports that were

marked "Review" by GIS and then assigned a "Fail" grade by GEICO for particular reasons. Id. ¶¶ 3-4; Suppl. Camacho Decl. ¶ 8. Therefore, the class is readily ascertainable.

B.   **Rule 23(a)(1) Numerosity**

The first of the Rule 23(a) requirements is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "'No specified number is needed to maintain a class action'" under Fed. R. Civ. P. 23; rather, "'application of the rule is to be considered in light of the particular circumstances of the case.'" Brady v. Thurston Motor Lines, 726 F.2d 136, 145 (4th Cir. 1984) (quoting Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967) (finding that a class of 18 was sufficient to fulfill the numerosity requirement)). "Courts consider a number of factors in considering whether joinder is practicable including the size of the class, ease of identifying its numbers and determining their addresses, facility of making service on them if joined and their geographic dispersion." Thomas v. FTS USA, LLC, 312 F.R.D. 407, 416 (E.D. Va. 2016) (internal quotations omitted).

GEICO has produced a spreadsheet indicating that, during the relevant time period, the reports of 426 individuals were assigned a "Fail" grade based on criminal history at some point in the application process. Suppl. Camacho Decl. ¶ 8.a. GEICO

argues that this is the relevant number here. Branch, however, contends that the spreadsheet is inadmissible hearsay. It relies instead on a statement by GEICO's counsel at oral argument that approximately 400 individuals were assigned a "Fail" grade based on their criminal histories. As noted, the Court previously considered and rejected Branch's hearsay argument. Summary Judgment Op. at 8-20. Therefore, Branch can satisfy the numerosity requirement by reference to the spreadsheet.

### C.    Rule 23(a)(2) Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The commonality requirement "turn[s] on questions of law [or fact] applicable in the same manner to each member of the class." Califano v. Yamasaki, 442 U.S. 682, 701 (1979). "This does not mean merely that [class members] have all suffered a violation of the same provision of law," but instead that "their claims . . . depend upon a common contention" that is "capable of classwide resolution." Dukes, 564 U.S. at 350. "A single common question will suffice," but that question "must be of such a nature that its determination 'will resolve an issue that is central to the validity of each one of the claims in one stroke.'" EQT Prod., 764 F.3d at 360 (quoting Dukes, 564 U.S. at 350). Furthermore, "[m]inor factual variances" do not prevent a plaintiff from showing commonality as long as the claims arise

14

from the same set of facts and the putative class members rely on the same legal theory. Brown v. Transurban USA, Inc., 318 F.R.D. 560, 567 (E.D. Va. 2016).

Branch asserts that there are common questions because the putative class members' claims all flow from GEICO's uniform background check process. Branch specifically cites three common questions that must be resolved: (1) whether assigning a "Fail" grade is an adverse action; (2) whether GEICO's pre-adverse action notice was timely, and (3) whether GEICO acted willfully in violating the FCRA.

The Court has consistently held that, by itself, the question of whether a defendant's actions violated Section 1681b(b)(3)(A) satisfies the commonality requirement. See Thomas, 312 F.R.D. at 418; Manuel v. Wells Fargo Bank, Nat'l Ass'n, No. 3:14CV238, 2015 WL 4994549, at *11 (E.D. Va. Aug. 19, 2015); Milbourne v. JRK Residential Am., LLC, No. 3:12CV861, 2014 WL 5529731, at *6 (E.D. Va. Oct. 31, 2014). In those cases, the Court noted the importance of each defendant's admissions about its "standardized" background check process. Thomas, 312 F.R.D. at 413, 418; Manuel, 2015 WL 4994549, at *2, *12; Milbourne, 2014 WL 5529731, at *2, *6. Similarly, here, GEICO has acknowledged that it used the Adjudication Process for all applicants during the class period.

15

The facts of this case closely resemble those in <u>Manuel</u>. There, the Court found that the commonality requirement was satisfied for a similar subclass to Branch's putative class because defendant automatically sent a pre-adverse action notice to each class member that was coded as ineligible for employment, and because these procedures were "standard" throughout the class period. <u>Manuel</u>, 2015 WL 4994549, at *11. GEICO has admitted to using a nearly identical process throughout the class period. Therefore, as in <u>Manuel</u>, the question of whether GEICO's actions violated Section 1681b(b)(3)(a) satisfies the commonality requirement.[5]

Branch also points to GEICO's willfulness in violating the FCRA as a common question. The Court has held that this question is a common one when "[t]here is no contention that [Defendant's] state of mind as to individual consumers varied in any way." <u>Id.</u> at *10 (internal quotations omitted). GEICO has not presented any evidence that its state of mind varied in any way during the class period. Willfulness is therefore also a common question here.

---

[5] This is true despite the factual differences between Branch's application and those of the putative class members. <u>See</u> <u>Brown</u>, 318 F.R.D. at 567. These differences, although compelling, are better discussed in connection with the more demanding Rule 23(b)(3) predominance requirement. <u>See</u> <u>Comcast</u>, 569 U.S. at 34.

## D.  Rule 23(a)(3) Typicality

The typicality element requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The Fourth Circuit has explained that, to satisfy this requirement, the "plaintiff's claim cannot be so different from the claims of absent class members that their claims will not be advanced by plaintiff's proof of [her] own individual claim." Deiter v. Microsoft Corp., 436 F.3d 461, 466-67 (4th Cir. 2006). Nonetheless, "plaintiff's claim and the claims of class members [need not] be perfectly identical or perfectly aligned," as long as "the variation in claims [does not] strike[] at the heart of the respective causes of actions." Id. at 467.

The typicality analysis "involves[s] a comparison of the plaintiffs' claims or defenses with those of the absent class members." Id. To conduct that analysis, the Court must "begin with a review of the elements of plaintiff['s] prima facie case and the facts on which the plaintiff would necessarily rely to prove it." Id. The district court must then determine "the extent to which those facts would also prove the claims of the absent class members." Id. Under this framework, "'many courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct.'" Plotnick v. Computer

17

Scis. Corp. Deferred Comp. Plan for Key Execs., 182 F. Supp. 3d
573, 582 (E.D. Va. 2016) (quoting 7A Charles Alan Wright, Arthur
R. Miller & Mary Kay Kane, Federal Practice & Proc. § 1764 (3d
ed. 2005)).

Branch argues that her claim is typical because, like every
class member, she must demonstrate that GEICO violated Section
1681b(b)(3)(A) when it assigned her a "Fail" grade without
providing her with the required documents. Moreover, Branch's
claim arises from GEICO's use of its standard Adjudication
Process, and is thus identical to the class members' claims.
Indeed, Branch states, a GEICO employee has acknowledged that
"there was nothing 'atypical or unique about the way GEICO
handled . . . Branch's background check process.'" Pl. Mem. (ECF
No. 67) at 17 (quoting GEICO 30(b)(6) Dep. (ECF No. 67-1) at
90:3-6).

GEICO makes two arguments in response. First, the only
adverse action in this case occurred when GEICO sent the Adverse
Action Letter, and more than 25% of the applicants who received
a "Fail" grade because of their criminal histories had their
grades changed to "Pass" or "No Grade" before GEICO sent that
letter. Second, even if the "Fail" grade could be construed as
GEICO's final decision in some cases, there is "no typical set
of facts that would allow the jury to uniformly

test . . . Branch's adverse action theory." Def. Opp. (ECF No. 71) at 23.

GEICO's first argument misinterprets Branch's claim. All putative class members were assigned a "Fail" grade because of their criminal histories at some point in the application process, which triggered the sending of the Pre-Adverse Action Letter to each class member, and then the Adverse Action Letter if the applicant failed to dispute the contents of the background report. Branch contends that the adverse action in that process was GEICO's assignment of the "Fail" grade, not the sending of the Adverse Action Letter. GEICO clearly disagrees with that position. Yet its argument here essentially asks the Court to decide again whether assigning a "Fail" grade is an adverse action under the FCRA. The Court denied summary judgment because it found that assigning a "Fail" grade could be considered an adverse action in certain situations. Summary Judgment Op. at 32-34. Accepting GEICO's argument here would require the Court to reverse that conclusion.

However, GEICO's second assertion poses a more serious challenge to certification. The Court has found the typicality requirement met in similar cases because defendants' hiring processes were applied identically to the plaintiffs and the absent class members. See, e.g., Thomas, 312 F.R.D. at 419; Manuel, 2015 WL 4994549, at *14. In those cases, the FCRA

violations were related to the hiring processes themselves, so the plaintiffs' and class members' claims could thus be said to "stem from . . . a unitary course of conduct." <u>Plotnick</u>, 182 F. Supp. 3d at 582 (internal quotations omitted). Here, on the other hand, the Court has recognized that GEICO's Adjudication Process is not inherently flawed, because it gives applicants a legitimate opportunity to cure their "Fail" grades. Indeed, GEICO's records show that many putative class members have done so. Summary Judgment Op. at 29-31. Nonetheless, other evidence indicated that a GEICO employee, Parker, might have deviated from the Adjudication Process by rescinding Branch's conditional offer of employment during a telephone call before the cure period expired. <u>Id.</u> at 32. In other words, the FCRA violation in this case, if any, stemmed not from the Adjudication Process itself, but rather from the individualized application of the Adjudication Process to Branch.

This distinction affects how Branch and the class members will prove their claims. For the reasons detailed above, Branch cannot establish a violation of Section 1681b(b)(3)(A) by showing only that GEICO did not provide her with the required documents before assigning a "Fail" grade to her background report. To the contrary, she must also prove that Parker actually rescinded Branch's job offer when they spoke, well before GEICO sent the Adverse Action Letter—thereby depriving

Branch of any real opportunity to cure the deficiency in her criminal history that led to the "Fail" grade. Proving these facts would not "necessarily advance" other class members' claims, Brown, 318 F.R.D. at 567, because there is no evidence that GEICO employees had similar conversations with any class members besides Branch. Consequently, those class members must point to their own interactions with GEICO during the cure period promised by the Adjudication Process to demonstrate that GEICO did not afford them a real chance to cure. The factual differences between Branch's and the absent class members' claims are therefore substantial enough to "strike[] at the heart of the[ir] respective causes of action." Dieter, 436 F.3d at 466; see also Boley v. Brown, 10 F.3d 218, 223 (4th Cir. 1993) (affirming denial of class certification where determination of liability "[wa]s dependent upon consideration of the unique circumstances pertinent to each class member"). Given these distinctions, Branch has not satisfied the typicality requirement.

### E. Rule 23(a)(4) Adequacy of Representation

The adequacy of representation prong of Rule 23(a) requires the Court to be satisfied that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This standard is met if "the named plaintiff does not have interests antagonistic to those of the

21

class[,] and . . . plaintiff's attorneys are qualified, experienced, and generally able to conduct the litigation." Brown, 318 F.R.D. at 567 (internal quotations omitted). The primary purpose of this element is "to uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). For a defendant to meet its burden in showing inadequacy of representation, "a conflict 'must be more than merely speculative or hypothetical.'" Gunnells v. Healthplan Servs., Inc., 348 F.3d 417, 430 (4th Cir. 2003) (quoting Moore et al., supra, § 23.25[4][b][ii]).

Branch's counsel is qualified, experienced, and able to conduct this litigation so as to provide full and adequate representation. Counsel is experienced in class action work, as well as consumer protection issues, and has been approved by this Court and others as class counsel in numerous cases.[6] See Bennett Decl. (ECF No. 42-3) ¶ 10; Kelly Decl. (ECF No. 42-4) ¶ 9. GEICO does not contend otherwise.

Branch argues that she adequately represents the proposed class because she has no interests antagonistic to those of the

---

[6] However, GEICO notes that the declarations submitted in support of class certification by Branch's counsel only account for five of the nine lawyers that have appeared on Branch's behalf. It argues that the other four attorneys should not be appointed as class counsel because the Court lacks any information about their qualifications. The absence of declarations by those attorneys precludes their appointment as class counsel.

proposed class, has cooperated with her counsel, and has pursued this litigation vigorously. She has also participated in discovery by answering interrogatories and turning over documents, communicated frequently with her counsel, and been deposed. Finally, Branch and the absent class members have the same interest in establishing GEICO's liability. GEICO similarly does not contest these assertions.

Branch's final assertion about Branch's overlapping interests with absent class members is not entirely correct. Branch's failure to establish typicality can have implications for the adequacy requirement. See Soutter, 307 F.R.D. at 210 n.15 ("[I]f a plaintiff is not typical, she cannot be adequate."); William B. Rubenstein, Newberg on Class Actions § 3:57 (5th ed. 2013) ("If a class representative's claim is not typical, she may not have the motivation or incentives to adequately pursue the claims of other class members." (citing In re Am. Med. Sys., Inc., 75 F.3d 1069, 1083 (6th Cir. 1996))). Indeed, as noted, the absent class members' FCRA violations, if any, quite likely resulted from different actions than Branch's, given that GEICO allegedly ignored the Adjudication Process' cure period requirement when dealing with Branch. Thus, Branch's interests are not exactly aligned with those of the absent class members.

Nonetheless, these differences do not preclude Branch from establishing adequacy. The primary purpose of this requirement is to avoid "conflicts of interest" between the plaintiff and the absent class members. Amchem Prods., 521 U.S. at 625. Even though Branch may have somewhat different motivations here than the absent class members, her interests cannot be characterized as "antagonistic to those of the class," as would defeat adequacy. Brown, 318 F.R.D. at 567; see also Amchem Prods., 521 U.S. at 626 (conflict shown where some class members sought "generous immediate payments," and others sought "an ample, inflation-protected fund for the future"). It appears that she is just as interested as any other class member in establishing GEICO's liability, given the effect that GEICO's adverse action may have had on her. Any conflicts that might exist are thus, at this stage, "merely speculative or hypothetical." Gunnells, 348 F.3d at 430 (internal quotations omitted). As a result, Branch is an adequate class representative.

## III.  Rule 23(b)(3)

To be certified, the class must also satisfy at least one of the class categories defined in Rule 23(b). Certification under Rule 23(b)(3), as Branch seeks, is appropriate where the Court "finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

## A. Predominance

Under Rule 23(b)(3), the common questions found under Rule 23(a)(2) "must predominate over any questions affecting only individual members." Amchem Prods., 521 U.S. at 615. Whether common questions predominate over individual questions "is a separate inquiry, distinct from the requirements found in Rule 23(a)." Ealy v. Pinkerton Gov't Servs., Inc., 514 F. App'x 299, 305 (4th Cir. 2013) (citing Dukes, 564 U.S. at 359). This requirement is "even more demanding than Rule 23(a)," Comcast, 569 U.S. at 34, and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation," Amchem, 521 U.S. at 623. The Court cannot just examine whether common questions outnumber noncommon ones, since "Rule 23(b)(3)'s commonality-predominance test is qualitative rather than quantitative." Stillmock v. Weis Markets, Inc., 385 F. App'x 267, 272 (4th Cir. 2010) (citing Gunnells, 348 F.3d at 429). In other words, Rule 23(b)(3) "compares the quality of the common questions to those of the noncommon questions." Newberg, supra, § 3:27.

If the "qualitatively overarching issue" in the litigation is common, a class may be certified notwithstanding the need to resolve individualized issues. Ealy, 514 F. App'x at 305. For

example, if "'common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain.'" <u>Stillmock</u>, 385 F. App'x at 273 (quoting <u>Smilow v. Sw. Bell Mobile Sys., Inc.</u>, 323 F.3d 32, 40 (1st Cir. 2003)). This makes sense because certification in such cases will still "achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." <u>Gunnells</u>, 348 F.3d at 424.

Branch asserts that the predominant issues in this case are whether GEICO's Adjudication Process satisfies the FCRA's requirements and, if not, whether its failure to comply with the FCRA was willful. She claims that these issues may be decided uniformly for all class members with virtually identical proof. In response, GEICO contends that, because the Adjudication Process complies with the FCRA, the sole evidence that could establish GEICO's Section 1681b(b)(3)(A) violation is based on Branch's own application to GEICO. Consequently, it says, the Court would need to conduct similar individualized inquiries to determine when GEICO took adverse action as to each class member.[7]

---

[7] For instance, "did other applicants receive phone calls that communicated rescissions? If so, did those individuals

GEICO is correct that Branch has failed to satisfy the predominance requirement here. Branch's assertion that "[e]ither the adjudication of 'Fail' based on someone's criminal history is an adverse action . . . or it is not" is mistaken. Pl. Reply (ECF No. 72) at 3. The central common question, according to Branch, is whether GEICO took an adverse action as to each class member when it assigned their reports a "Fail" grade because of the criminal history. But, as noted, that question cannot be answered by looking at the Adjudication Process itself. Instead, the adverse action inquiry necessarily involves examining GEICO's conduct with each individual after assigning the "Fail" grades, to decide whether GEICO complied with the Adjudication Process' requirement that conditional job offers not be rescinded until the end of the seven-day cure period.[8] That conclusion follows from the Court's acknowledgement that assigning a "Fail" grade does not violate Section 1681b(b)(3)(A) unless an applicant is, contrary to the Adjudication Process,

---

nevertheless attempt to dispute the report? What was the outcome of that dispute? Did the individual receive a grade change to 'Pass'? Or did the applicant simply decide to withdraw from consideration, resulting in a final grade of 'No Grade'?" Def. Opp. at 21.

[8] Of course, not all conduct after the "Fail" grade is assigned is relevant here. For instance, whether class members' grades were eventually changed to "Pass" or "No Grade" is immaterial to Branch's theory that GEICO took adverse action when it assigned the "Fail" grades, since the adverse action would have already occurred by the time GEICO changed those class members' grades.

denied a legitimate opportunity to cure the deficiency causing that grade. See Summary Judgment Op. at 28-33. Thus, although Branch correctly identifies as a common question whether assigning a "Fail" grade is an adverse action, the "qualitatively overarching issue" here is the narrower, individualized question of whether class members in fact had a legitimate opportunity to cure their "Fail" grades. Ealy, 514 F. App'x at 305.

In Branch's case, the potential adverse action occurred when Parker called Branch and allegedly told her that her conditional offer was rescinded, depriving her of the legitimate cure period promised by the Adjudication Process. Yet Branch points to no evidence suggesting that GEICO similarly deviated from the Adjudication Process with other class members. As a result, the Court would need to consider each class members' interactions with GEICO to determine when, if at all, GEICO denied them a chance to fix their criminal histories before the cure period expired. Resolving this individualized issue is a necessary predicate to answering the more general question of whether assigning a "Fail" grade is an adverse action. Accordingly, that common question does not "predominate over any questions affecting only individual members," Amchem Prods., 521 U.S. at 615; indeed, the opposite is true. For those reasons, Branch has failed to meet the predominance requirement.

GEICO's additional argument regarding Article III standing further illustrates the predominance issues posed by Branch's class definition. As GEICO asserts, assigning a "Fail" grade does not automatically violate the FCRA, so "case-by-case investigation" is required to determine which class members suffered a "concrete injury" sufficient to satisfy Article III.[9] Def. Opp. at 26.

A plaintiff must have standing in order for the Court to exercise its jurisdiction over this case under Article III. See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547 (2016). The first of the three standing requirements, and the only one relevant here, is that the plaintiff "must have suffered an injury in fact." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992) (quotation marks omitted). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Spokeo, 136 S. Ct. at 1548 (quoting Lujan, 504 U.S. at 560). In a class action, the standing inquiry focuses on

---

[9] This claim is based on the argument that Branch's use of Rule 23 violates the Rules Enabling Act, which states that the Federal Rules of Civil Procedure "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072. But, as noted below, GEICO appears to be highlighting these Article III standing concerns in connection with the predominance requirement. Therefore, the Court need not resolve the separate question of whether Branch has violated the Rules Enabling Act.

"the allegations of personal injury made by the named plaintiff." Dreher v. Experian Info. Sols., Inc., 856 F.3d 337, 343 (4th Cir. 2017). Furthermore, an FCRA violation does not necessarily cause an injury in fact; "[r]ather, a constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled and that the denial of that information creates a 'real' harm with an adverse effect." Id. at 345 (quoting Spokeo, 136 S. Ct. at 1548) (emphasis in original).

GEICO does not dispute that Branch, the named plaintiff here, has standing. Nor could it—as GEICO itself acknowledges, a concrete injury exists if an employer takes adverse action under Section 1681b(b)(3)(A) without first providing the required documents. See Thomas v. FTS USA, LLC, 193 F. Supp. 3d 623, 638 (E.D. Va. 2016). And, Branch has alleged that GEICO failed to provide her with these documents before it took adverse action by assigning her background report a "Fail" grade.

Instead, GEICO's argument is that some absent class members have not suffered an injury that would satisfy Article III's standing requirements because their grades were changed to "Pass" or "No Grade" after the initial "Fail" grade was assigned. This lack of injury means that many individualized questions remain about which class members suffered a concrete injury. Thus, GEICO's argument is not that the Court lacks

jurisdiction over those absent class members that cannot establish Article III standing, but instead that the possibility that some class members did not suffer injuries causes individual injury issues to predominate. See Henderson v. Corelogic Nat'l Background Data, LLC, No. 3:12CV97, 2016 WL 4611570, at *3 (E.D. Va. Sept. 2, 2016) (explaining distinction); see also Newberg, supra, § 2:6 ("[W]hen a class plaintiff shows individual standing, the court should proceed to Rule 23 criteria to determine whether . . . the plaintiff may serve in a representative capacity on behalf of the class.").

GEICO's discussion points out a key flaw in Branch's proposed class definition. Several courts have held that "no class may be certified that contains members lacking Article III standing," so "[t]he class must therefore be defined in such a way that anyone within it would have standing." Denney v. Deutsche Bank AG, 443 F.3d 253, 264 (2d Cir. 2006); see also Mazza v. Am. Honda Motor Co., 666 F.3d 581, 594 (9th Cir. 2012) (citing this statement approvingly in analyzing certification factors); Avritt v. Reliastar Life Ins. Co., 615 F.3d 1023, 1034 (8th Cir. 2010) (same); Kohen v. Pac. Inv. Mgmt. Co. LLC, 571 F.3d 672, 677 (7th Cir. 2009) (reaching similar conclusion to Denney); but see Neale v. Volvo Cars of N. Am., LLC, 794 F.3d 353, 368 (3d Cir. 2015) (rejecting attempts to "shoehorn the[] [Rule 23 factors] into an Article III analysis"). Branch's class

definition, however, fails to meet this standard. That definition includes all applicants who received a "Fail" grade because of their criminal histories. But, as discussed, applicants who received that grade and had a meaningful chance to correct it during the Adjudication Process' cure period did not suffer any adverse action. Some applicants might have, like Branch, effectively been denied that cure period, but those individuals cannot be identified without individualized inquiries about their communications with GEICO. Consequently, this Article III standing framework reiterates the prevalence of particularized factual issues that prevent Branch from satisfying the predominance requirement.

**B. Superiority**

Superiority requires that use of a class action be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Superiority "'depends greatly on the circumstances surrounding each case,'" and "'[t]he rule requires the court to find that the objectives of the class-action procedure really will be achieved in the particular case.'" Stillmock, 385 F. App'x at 274 (quoting Wright et al., supra, § 1779). When making this determination, the Court should "not contemplate the possibility that no action at all might be superior to a class action.'" Thomas, 312 F.R.D. at 425 (quoting Brown v. Cameron-Brown Co.,

92 F.R.D. 32, 49 (E.D. Va. 1981)). Factors the court should consider include: "(A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing the class action." Fed. R. Civ. P. 23(b)(3)(A)-(D). Ultimately, "[t]he goal is to ensure that class certification occurs only when economy and efficiency are reasonably likely to result." Ganesh, L.L.C. v. Comput. Learning Ctrs., Inc., 183 F.R.D. 487, 491 (E.D. Va. 1998).

Branch argues that a class action is superior in this case for several reasons. She contends that: it would waste judicial and individual resources to have hundreds of trials applying the same measure of damages; individual class members are not likely to understand that they might have a claim under the FCRA; individual class members are unlikely to bring suit under the FCRA because of the marginal statutory damages available; and litigation under the class action framework is effectively the only way that private individuals can enforce the FCRA. Furthermore, individual class members have not already filed FCRA lawsuits against GEICO based on these underlying facts. GEICO does not contest these assertions.

Nonetheless, Branch has not satisfied the superiority requirement here. It is true that Branch's and the absent class members' damages claims are relatively small, and that many class members would not bring suit because they are not aware of their FCRA rights. A class action would not, however, serve the interest of judicial economy in this case. A relevant consideration in analyzing superiority is "the amount of time and attention required to settle the common questions [compared] with that needed for the resolution of individual issues." Cameron-Brown Co., 92 F.R.D. at 42. For the reasons detailed above, the time needed to determine when and how each class member suffered adverse action would be substantial. Branch cannot show that GEICO's assignment of a "Fail" grade was an adverse action without first demonstrating that GEICO deviated from the Adjudication Process and rescinded her conditional offer before the cure period ended. Given the lack of class-wide evidence about rescission of offers (or similar conduct) during the cure period, to establish an FCRA violation, each of the other 425 class members would need to find and present their own proof that GEICO did not provide them with a legitimate opportunity to cure. "The managerial burden of conducting thousands of mini-trials on th[at] . . . issue[] would overwhelm any common questions of law or fact and eviscerate the efficiencies that classwide adjudication might otherwise

afford." Ganesh, L.L.C., 183 F.R.D. at 491; see also Fed. R. Civ. P. 23(b)(3)(D). Branch would thus be better suited conducting her own litigation, so that absent class members could either seek class resolution on a common theory that does not apply to Branch, or, alternatively, file individual FCRA claims based on their particular interactions with GEICO. Whatever the case, the class action is not the superior method of pursuing the FCRA claim in this case, and class certification is therefore inappropriate.

## CONCLUSION

For the foregoing reasons, PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION (ECF No. 66) will be denied.[10]

It is so ORDERED.

_____ /s/ _____

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: January _10_, 2018

---

[10] It is not necessary to consider GEICO's rather unique argument about personal jurisdiction, which is based on a rather strained reading of Bristol-Myers Squibb Co. v. Superior Court of California, 137 S. Ct. 1773 (2017) that has been soundly rejected by other courts. See Day v. Air Methods Corp., No. CV 5:17-183-DCR, 2017 WL 4781863, at *2 (E.D. Ky. Oct. 23, 2017); Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc., No. 17-CV-00564 NC, 2017 WL 4224723, at *5 (N.D. Cal. Sept. 22, 2017).